T.C. Memo. 2001-194


UNITED STATES TAX COURT


ESTATE OF HARVEY FEINSMITH, DECEASED, BETTY
FEINSMITH, EXECUTRIX, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16334-99.                    Filed July 27, 2001.


William S. Seplowitz, for petitioner.

Robin L. Peacock and Lydia A. Branche, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LARO, Judge:  Betty Feinsmith, in her individual capacity
and as executrix of the Estate of Harvey Feinsmith, Deceased (the
estate), petitioned the Court to redetermine respondent's
determination as to the 1983 and 1984 Federal income taxes of her
and her deceased husband, Harvey Feinsmith (Mr. Feinsmith).

Respondent determined that Mr. Feinsmith was liable under section 6653(b)(1) for $5,812 and $17,476 in additions to his 1983 and 1984 taxes, respectively. Respondent also determined that Mr. Feinsmith was liable for time-sensitive additions to those taxes under section 6653(b)(2). Respondent determined no deficiency as to Betty Feinsmith in her individual capacity.

Following the Court's dismissal of Betty Feinsmith in her individual capacity for lack of jurisdiction, and our amendment to the caption to reflect the same, we must determine whether the estate is liable for the additions to tax. We hold it is not. Section references are to the Internal Revenue Code applicable to the relevant years. Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts have been rounded.

FINDINGS OF FACT

Some facts have been stipulated. We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith. We find the stipulated facts accordingly. Mr. Feinsmith, whose education lasted through high school and possibly 1 year of college, died on June 6, 1995, at the age of 68. His widow, Betty Feinsmith, is the executrix of the estate. She resided in Deal, New Jersey, when the petition was filed.

Mr. Feinsmith and Betty Feinsmith filed joint 1983 and 1984 Federal income tax returns. They filed their 1983 return on or

about October 5, 1984. They filed their 1984 return on or about October 17, 1985. Randy Hall, Inc. (Randy Hall), a corporation in which petitioner was a shareholder, filed its 1982 Federal income tax return for its fiscal year ended January 31, 1983, on April 30, 1983. Randy Hall filed its 1983 Federal income tax return for its fiscal year ended January 31, 1984, on April 28, 1984.

Randy Hall manufactured T-shirts and ladies sportswear. During the subject years, its common stock was owned equally by Mr. Feinsmith, Carl Perry (Mr. Perry), and Donald Rosenthal (Mr. Rosenthal). Mr. Feinsmith served as its president and production manager. Mr. Perry served as its secretary/treasurer and salesman. Mr. Rosenthal served as its vice president and designer. Randy Hall's shareholders during its fiscal year ended January 31, 1981, were Mr. Perry, Mr. Rosenthal, and Samuel Mandel (Mr. Mandel). Mr. Feinsmith replaced Mr. Mandel as a Randy Hall shareholder towards the end of 1982 and began working for Randy Hall at that time. Mr. Mandel retired at the same time.

During its fiscal years ended January 31, 1981, 1983, and 1984, Randy Hall participated in a massive false invoice scheme (the scheme) in which it bought invoices listing falsely that it purchased yarn from various vendors. The scheme was promoted by Schnejer Zalman Gurary, Nochum Sternberg (Gurary's son-in-law),

and Esther Sternberg (Nochum's wife) (collectively, the promoters). Under the scheme, the promoters sold invoices to corporations in the garment industry, falsely reflecting that one of the promoters' companies had sold yarn to the invoice-purchasing company. Principals of the invoice-purchasing companies provided the promoters with company checks in the amounts of the false invoices, and the promoters returned cash to the principals in the amount of the checks less a processing fee. No actual yarn was involved. The invoice-purchasing companies included the purported cost of the nonexistent yarn in their calculations of cost-of-goods-sold for tax purposes, fraudulently misstating their taxable income. The principals converted some of the cash to their personal use without declaring those funds as income on their tax returns. Ultimately, the promoters were convicted for their parts in the scheme, and their convictions were affirmed on appeal. See United States v. Gurary, 860 F.2d 521 (2d Cir. 1988).

Randy Hall began participating in the scheme before Mr. Feinsmith was a Randy Hall shareholder. Mr. Mandel originally purchased the false invoices on behalf of Randy Hall, and he did so with the knowledge of the other two shareholders (i.e., Messrs. Perry and Rosenthal). Randy Hall continued to purchase the false invoices after Mr. Mandel's retirement. At all times, Randy Hall paid for the false invoices by checks, and the

promoters returned to Randy Hall cash equal to the amount of the checks less the commission.  Randy Hall bought the invoices to generate documentation to support an inflated cost of goods sold deduction reported on its tax returns.[1]  None of the yarn referenced in the false invoices was ever delivered to Randy Hall.

Randy Hall issued checks to the false invoice sellers for 35 false invoices.  Randy Hall required that all of these checks be signed by two of its shareholders.  The date and amount of each of the 35 false invoices is as follows:

| Invoice Date | Invoice Amount |
| --- | --- |
| Oct.  6, 1980 | $13,328 |
| Oct.  8, 1980 | 12,826 |
| Oct.  9, 1980 | 10,472 |
| Oct. 10, 1980 | 14,111 |
| Oct. 15, 1980 | 8,119 |
| Nov.  5, 1980 | 17,494 |
| Nov.  6, 1980 | 6,098 |
| Nov.  7, 1980 | 8,033 |
| Nov. 10, 1980 | 10,151 |
| Nov. 12, 1980 | 16,190 |
| Nov. 14, 1980 | 13,619 |
| Jan.  2, 1981 | 11,866 |
| Jan.  5, 1981 | 14,345 |
| Jan.  6, 1981 | 8,340 |
| Jan.  8, 1981 | 15,406 |
| Jan.  9, 1981 | 13,523 |
|  | 193,922 ($1 rounding error) |
| Dec.  8, 1982 | $15,988 |
| Dec. 10, 1982 | 13,812 |
| Dec. 14, 1982 | 16,403 |

---

[1] Although cost of goods sold is not actually a "deduction", the parties and many of the exhibits in evidence sometimes refer to it as such.  We do the same.

| | |
|---|---|
| Dec. 17, 1982 | 13,319 |
| Jan. 10, 1983 | 15,477 |
| Jan. 14, 1983 | 19,200 |
| | 94,199 |
| | |
| Dec. 2, 1983 | $16,052 |
| Dec. 5, 1983 | 16,933 |
| Dec. 6, 1983 | 14,607 |
| Dec. 7, 1983 | 15,701 |
| Dec. 9, 1983 | 12,831 |
| Dec. 12, 1983 | 14,644 |
| Dec. 16, 1983 | 15,255 |
| Dec. 20, 1983 | 17,231 |
| Dec. 27, 1983 | 16,344 |
| Jan. 4, 1984 | 17,363 |
| | 156,961 |
| | |
| Jan. 4, 1984 | $17,363 |
| Jan. 6, 1984 | 16,114 |
| Jan. 9, 1984 | 15,702 |
| | 49,179 |

The United States Attorney's Office for the Southern District of New York (U.S. Attorney's Office) began investigating the scheme and included Randy Hall and its shareholders within its investigation. In connection therewith, the U.S. Attorney's Office proposed to Mr. Feinsmith an agreement (the cooperation agreement) under which Mr. Feinsmith would agree with the U.S. Attorney's Office to cooperate in its investigation in exchange for immunity from criminal prosecution for any offense connected to the scheme. The U.S. Attorney's Office proposed the agreement to Mr. Feinsmith in order to secure his cooperation in its investigation into the scheme. On March 29, 1985, Mr. Feinsmith agreed to the terms of the cooperation agreement, which had been

drafted by the U.S. Attorney's Office.[2]  In part, Mr. Feinsmith

agreed in the cooperation agreement:

> that Randy Hall, Inc. will pay to the Internal Revenue
> Service all federal income taxes due and owing by Randy
> Hall, Inc. for the fiscal years ending January 31, 1981
> to the present; and that Harvey Feinsmith will pay all
> personal income taxes due and owing for the period
> February 1, 1980 to the present.  Mr. Feinsmith
> acknowledges that Randy Hall, Inc. claimed nonexistent
> and fraudulent business deductions of approximately
> $337,000 on its federal income tax returns for the
> years 1980 to the present; and that Harvey Feinsmith
> received approximately $48,000 of income which he did
> not report on his federal income tax returns for the
> years 1982 to the present.  Mr. Feinsmith agrees that
> he will set forth in a sworn affidavit the false
> invoices (including date, amount and issuing company)
> that created the fraudulent business deductions and the
> unreported income and will admit in the affidavit that
> Randy Hall, Inc. claimed nonexistent and fraudulent
> business deductions of approximately $337,000 on its
> federal income tax returns for the fiscal years ending
> January 31, 1981 to the present, and that Harvey
> Feinsmith received approximately $48,000 of income
> which he did not report on his federal income tax
> returns for the years 1982 to the present.  Mr.
> Feinsmith further agrees to provide this affidavit to
> officials of the Internal Revenue Service at this
> Office's request.  Mr. Feinsmith further agrees that
> Randy Hall, Inc. will file amended federal income tax
> returns with the affidavit attached as an exhibit for
> the fiscal years ending January 31, 1981 to the present
> no later than December 31, 1985; and Mr. Feinsmith
> further agrees that he will file amended personal

---

[2] The record does not indicate why Mr. Feinsmith agreed to enter into the cooperation agreement.  We surmise that he faced the possibility of criminal prosecution, but whether that prosecution would come in his capacity as Randy Hall's president or in his individual capacity we do not know.  We do know, however, that the assistant U.S. attorney who conducted the investigation and drafted the cooperation agreement was unable in this proceeding to acknowledge that Mr. Feinsmith knew at the time of the agreement that Randy Hall's 1982 and 1983 tax returns contained false deductions.

income tax returns for the period February 1, 1980 to the present, attaching the affidavit to the returns as an exhibit, no later than December 31, 1985.

Pursuant to the cooperation agreement, Mr. Feinsmith filed an amended 1983 personal income tax return on January 6, 1986. He reported on that return additional income of $31,667, representing what he believed was his 1/3 share of Randy Hall's false invoice deduction attributable to its taxable year ended January 31, 1983.  Mr. Feinsmith's 1/3 share was actually $31,399.81.  The parties agree that $31,399.81 is a constructive dividend to Mr. Feinsmith for 1983, arising out of deductions not allowable on Randy Hall's 1982 corporate income tax return.

Pursuant to the cooperation agreement, Randy Hall filed an amended 1983 return on January 7, 1986.  Randy Hall reported on that return a $49,179 increase in income resulting from its reduction of its cost of goods sold as originally reported. Randy Hall acknowledged on the return that the reduction was required because it had originally included in its cost of goods sold computation nonexistent business deductions totaling $337,300.  Randy Hall reported that the following shareholders had "ADDITIONAL INCOME ARISING FROM THE AFOREMENTIONED DEDUCTIONS" in the corresponding calendar years:[3]

---

[3] The total of some of the rows and columns is off by $1. This discrepancy is attributable to rounding.

|              | Total     | 1981     | 1983     | 1984     |
|--------------|-----------|----------|----------|----------|
| Mr. Perry    | $112,433  | $64,641  | $31,400  | $16,393  |
| Mr. Rosenthal| 112,433   | 64,641   | 31,400   | 16,393   |
| Mr. Mandel   | 64,641    | 64,641   | 0        | 0        |
| Mr. Feinsmith| 47,793    | 0        | 31,400   | 16,393   |
| Total        | 337,300   | 193,922  | 94,199   | 49,179   |

Randy Hall attached to this amended return the affidavits of Messrs. Rosenthal and Perry. Mr. Perry's affidavit, which is virtually verbatim with Mr. Rosenthal's affidavit, stated as follows:

CARL PERRY, being duly sworn, deposes and says:

1. I am the Secretary-Treasurer and a shareholder of Randy Hall, Inc. Randy Hall, Inc. is filing amended federal income tax returns (Form 1120) for the fiscal years ending January 31, 1981, January 31, 1983, and January 31, 1984. I am filing amended personal tax returns (Form 1040) for calendar years 1981, 1983 and 1984. An original of this affidavit is being attached to each of the above-described amended returns to explain the purpose of the amendments and the nature of the adjustments to income.

2. During the period for which amended returns are being filed, Randy Hall, Inc. claimed false, non-existent business deductions in the amount of $337,300.28 for purported purchases which were not, in fact, made. * * *

3. The false deductions claimed by Randy Hall, Inc. were in the following amounts for each of the years for which amended returns are being filed:

| Fiscal Year Ending | Amount of False Deduction |
|--------------------|---------------------------|
| 1981               | $193,922.15               |
| 1983               | 94,199,43                 |
| 1984               | 49,178.70                 |
| Total:             | $337,300.28               |

4. During this same time period, and because of the false deductions referred to above, I received a

total of $112,433.43 in income which I did not report on my personal income tax returns during the period. The amount of additional income omitted in each of the years for which amended returns are being filed by me is as follows:

|       | Amount of         |
| Year  | Unreported Income |
|-------|-------------------|
| 1981  | $64,640.72        |
| 1983  | 31,399.81         |
| 1984  | 16,392.90         |
| Total:| $112,433.43       |

Randy Hall also filed an amended 1982 return in early 1986 pursuant to the cooperation agreement. On that return, Randy Hall reported a $94,199 increase in income resulting from its reduction of its cost of goods sold as originally reported. Randy Hall acknowledged on that return that the reduction was required because it had originally included in its cost of goods sold computation nonexistent business deductions totaling $337,300. Randy Hall reported that its four shareholders during the relevant time period had "ADDITIONAL INCOME ARISING FROM THE AFOREMENTIONED DEDUCTIONS" in the amounts set forth in the schedule shown above as to Randy Hall's amended 1983 return. Randy Hall attached to its amended 1982 return the same affidavits attached to its amended 1983 return.

Mr. Feinsmith filed an amended 1984 personal income tax return in early 1986 (or possibly late 1985) pursuant to the cooperation agreement. On that return, Mr. Feinsmith reported additional income of $16,333, representing what he believed was his 1/3 share of Randy Hall's false invoice deduction

attributable to its taxable year ended January 31, 1984. His 1/3 share was actually $16,392.90. The parties agree that $16,392.90 is a constructive dividend to Mr. Feinsmith arising out of deductions not allowable on Randy Hall's 1983 corporate income tax return. Mr. Feinsmith attached to his amended 1984 return an affidavit that stated in relevant part:

> HARVEY FEINSMITH, being duly sworn, deposes and says:
>
> 1. I am the President and a shareholder of Randy Hall, Inc. Randy Hall, Inc. is filing amended federal income tax returns (Form 1120) for the fiscal years ending January 31, 1981, January 31, 1983, and January 31, 1984. I am filing amended personal tax returns (Form 1040) for calendar years 1983 and 1984. An original of this affidavit is being attached to each of the above-described amended returns to explain the purpose of the amendments and the nature of the adjustments to income.
>
> 2. During the period for which amended returns are being filed, Randy Hall, Inc. claimed false, non-existent business deductions in the amount of $337,300.28 for purported purchases which were not, in fact, made. * * *
>
> 3. The false deductions claimed by Randy Hall, Inc. were in the following amounts for each of the years for which amended returns are being filed:
>
> | Fiscal Year Ending | Amount of False Deduction |
> |---|---|
> | 1981 | $193,922.15 |
> | 1983 | 94,199,43 |
> | 1984 | 49,178.70 |
> | Total: | $337,300.28 |
>
> 4. During the years 1983 and 1984, and because of the false deductions referred to above, I received a total of $47,792.71 in income which I did not report on my tax returns for those two years. I did not receive any income as a result of Randy Hall, Inc.'s false

deductions for the fiscal year ending January 31, 1981 because I was not a shareholder for any portion of that year.

5. The amount of additional income omitted in each of the years for which amended returns are being filed by me is as follows:

| Year | Amount of Unreported Income |
|------|------------------------------|
| 1983 | $31,399.81 |
| 1984 | 16,392.90 |
| Total: | $47,792.71 |

Pursuant to the cooperation agreement, Mr. Feinsmith filed a second amended 1984 personal income tax return on September 2, 1987. On this return, Mr. Feinsmith reported that, in addition to the income reported on his original and first amended return for 1984, he received from Randy Hall during that year a "Constructive Dividend" of $52,320. Mr. Feinsmith attached an affidavit to this second amended return stating:

HARVEY FEINSMITH, being duly sworn, deposes and says:

1. I am the President and a shareholder of Randy Hall, Inc. On or about December 31, 1985, Randy Hall, Inc. filed amended federal income tax returns (Form 1120) for the fiscal years ending January 31, 1981, January 31, 1983, and January 31, 1984. At the same time, I filed amended personal tax returns (Form 1040) for calendar years 1983 and 1984. An affidavit was attached to each of the above-described amended returns to explain the purpose of the amendments and the nature of the adjustments to income.

2. During the period for which amended returns were filed, Randy Hall, Inc. claimed false, non-existent business deductions for purported purchases which were not, in fact, made. At the time of filing the amended returns, the officers of Randy Hall, Inc. believed that the false deductions totalled

$337,300.28. During the years 1983 and 1984, and because of the false deductions of $337,300.28 on the corporate tax returns, I received a total of $47,792.71 in income which I did not report on my tax returns for those two years, but which was reported on my amended returns. I did not receive any income as a result of Randy Hall, Inc.'s false deductions for the fiscal year ending January 31, 1981 because I was not a shareholder for any portion of that year.

3. Subsequent to the filing of these amended returns, it came to our attention that certain additional false deductions for non-existent purchases had been claimed on one of the original corporate tax returns, but these deductions had not been discovered at the time of filing the amended returns.

4. The additional false deductions amounted to $156,960.90, and affected the corporate tax return for the tax year ending January 31, 1984, and my personal return for the calendar year ended December 31, 1984. * * * These false deductions resulted in additional income to me of $52,320.20 which I did not report on my original or amended tax return but which is being reported on my second amended return which is being filed along with a second amended corporate return.

Pursuant to the cooperation agreement, Randy Hall filed a second amended 1983 return on or about September 2, 1987. On that return, Randy Hall reported a $156,961 increase in income resulting from a reduction of cost of goods sold due to additional false deductions and an offset to that amount by a $206,651 net operating loss carryback from its fiscal year ended January 31, 1987. Randy Hall attached to its second amended return a statement which provided that it had ascertained after filing its first amended return for that year that it had claimed on its original 1983 return additional false deductions aggregating $156,961. The statement provided that these

deductions resulted in $156,961 of additional income that was to be reported $52,321 by Mr. Perry, $52,320 by Mr. Rosenthal, and $52,320 by Mr. Feinsmith. Randy Hall attached to that second amended return the affidavits of Messrs. Feinsmith, Rosenthal, and Perry, which read virtually verbatim. The affidavit of Mr. Feinsmith was the one that he attached to his second amended return for 1984.[4]

## OPINION

We decide whether the estate is liable for the additions to tax for fraud determined by respondent. Respondent must prove this determination by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1113 (1983). Fraud requires a showing that the taxpayer intended to evade a tax known or believed to be owing. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968). Here, respondent must prove: (1) Mr. Feinsmith underpaid his taxes for each of the subject years and (2) some part of each underpayment was due to fraud. Respondent must also prove for purposes of section 6653(b)(2) the portion of the underpayments attributable to fraud. See sec. 6653(b)(2); see also Cooney v. Commissioner, T.C. Memo. 1994-50.

---

[4] The parties agree that Randy Hall's second amended return overstated by $17,362.80 its income for the fiscal year ended Jan. 31, 1984, and that Mr. Feinsmith's 1984 income from the scheme should be reduced by $5,787.60.

We begin our analysis with the first prong of section 6653(b)(1); i.e., whether Mr. Feinsmith underpaid his taxes in 1983 and/or 1984. Mr. Feinsmith amended his personal income tax returns for both of those years to report additional income. Because those amended returns are admissions of tax underpayments, Badaracco v. Commissioner, 464 U.S. 386, 399 (1984), we hold for respondent as to this prong.

Turning to the second prong of section 6653(b)(1), i.e., the presence of fraud, the existence of fraud is a question of fact. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.3d 1383 (8th Cir. 1978). Fraud is never presumed or imputed; it must be established by independent evidence that establishes a fraudulent intent on the taxpayer's part. Otsuki v. Commissioner, 53 T.C. 96 (1969). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492 (1943); Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

We often rely on certain indicia of fraud to decide the existence of fraud. The presence of several indicia is persuasive circumstantial evidence of fraud. Beaver v. Commissioner, 55 T.C. 85, 93 (1970). The "badges of fraud" include: (1) The filing of false documents, (2) understatement

of income, (2) maintenance of inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, (5) failure to cooperate with tax authorities, (6) engaging in an illegal activity, (7) attempting to conceal an illegal activity, and (8) dealing in cash. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).

Respondent argues that he has clearly and convincingly proven fraud by virtue of the following claimed actions on the part of Mr. Feinsmith: (1) That he understated his income and the income of Randy Hall for the relevant years, (2) that he failed to maintain adequate records for Randy Hall, including that some of the maintained records were false invoices, (3) that his accountant testified that Mr. Feinsmith did not tell the accountant when the accountant prepared Mr. Feinsmith's 1983 and 1984 personal income tax returns that he had income from the scheme, (4) that he was engaged in the scheme, an illegal activity, (5) that the scheme involved the use of cash, and (6) that he was an astute businessman. Petitioner argues that respondent has not proven fraud either clearly or convincingly. We agree with petitioner. We are unconvinced by the record that Mr. Feinsmith filed either his 1983 or 1984 Federal income tax return with the requisite intent to evade a personal Federal income tax known or believed to be owing.

Respondent focuses in part on the operations of Randy Hall to deduce that Mr. Feinsmith had the requisite fraudulent intent. We do not do similarly. The fact that Randy Hall may have been involved in a fraudulent scheme to attempt to evade its Federal income tax obligation, or that Mr. Feinsmith may have participated in such an attempt, does not necessarily mean that Mr. Feinsmith was involved in a scheme to attempt to evade his Federal income tax obligation as well. Nor does the fact that Randy Hall may have understated its income for the subject years, or kept inadequate records, impute to Mr. Feinsmith the requisite fraudulent intent to avoid his Federal income tax obligation. The fact that Randy Hall may have participated in an illegal activity (the scheme) and that this activity involved cash also does not establish fraud on the part of Mr. Feinsmith in his individual capacity.

When we focus as we should on Mr. Feinsmith's personal income tax obligation, we are unconvinced by the record that he filed his 1983 and/or 1984 Federal income return intending to evade that obligation. We simply cannot find that Mr. Feinsmith was actually involved with the scheme in his individual capacity or that he converted any of the proceeds from the scheme to his personal use. In fact, when Mr. Feinsmith first became affiliated with Randy Hall, it had been participating in the scheme for at least 2 years. We find no reliable evidence in the

record to suggest that Mr. Feinsmith, in his individual capacity, was involved in the scheme either when he joined Randy Hall or at any time thereafter. Although respondent invites the Court to find as facts that Mr. Feinsmith was the mastermind of the scheme as it related to Randy Hall, that he was in charge of Randy Hall's finances, that he handled all of the checks and cash which passed between Randy Hall and the promoters, and that he converted some of the cash to his personal use, we decline to do so on the basis of the record.

Respondent relies solely on Mr. Perry's answer to a question asked by respondent's counsel at trial to support a finding that Mr. Feinsmith personally received cash from the scheme. The question and answer are as follows:

> Q  Okay.  And did you know if Harvey Feinsmith also received income back?

> A  Of course, we were partners, so we shared equally.

We find Mr. Perry's testimony unpersuasive (both as to this point and generally overall). Mr. Perry's testimony was vague, uncorroborated, and sometimes inconsistent. Mr. Perry testified, for example, that Mr. Feinsmith maintained Randy Hall's books but later testified that Mr. Feinsmith asked him for the books so that Mr. Feinsmith could give them to the Government. Mr. Perry also testified adamantly that Randy Hall's involvement with the scheme began with the arrival of Mr. Feinsmith but later admitted

that Randy Hall's involvement in the scheme began before that time. Mr. Perry also testified that Mr. Feinsmith was the only one who dealt with the promoters on behalf of Randy Hall and that Mr. Feinsmith was the only Randy Hall shareholder who actually knew the promoters' identity. The record indicates that Randy Hall purchased almost half of the false invoices before Mr. Feinsmith joined the company and that one of the promoters was wary that either Mr. Perry or Mr. Rosenthal would reveal the promoters' identity to the authorities.

We also bear in mind that Mr. Perry is an indicted criminal who pleaded guilty to his part in the scheme. Given the additional fact that Mr. Feinsmith was not charged in the scheme and that Mr. Feinsmith cooperated with the investigation of the U.S. Attorney's Office, including on at least one occasion secretly recording a conversation with an unidentified individual, we view Mr. Perry as a biased witness with animosity towards Mr. Feinsmith. In fact, Mr. Perry even indicated during his testimony that he has ill will towards Mr. Feinsmith and that he has an amiable, longstanding relationship with the other shareholder, Mr. Rosenthal.[5] We also note that Mr. Feinsmith, because he is dead, is unable to rebut personally Mr. Perry's testimony and that Mr. Perry displayed during his testimony a poor memory as to many facts, even acknowledging on various

---

[5] Mr. Perry even went so far as to testify baldly that Mr. Rosenthal had received none of the cash paid by the promoters.

occasions that he has trouble remembering events of the prior day let alone events that occurred during the subject years.

For some undisclosed reason, respondent chose not to introduce into evidence other testimony and/or exhibits to support his proposed finding that Mr. Feinsmith actually received cash from the scheme. Respondent could have presented the testimony of one or more of the promoters as to which Randy Hall shareholders they dealt with in the scheme. We understand from the record that the promoters insisted that their identity be known by only a limited number of individuals from each invoice-purchasing company. We are skeptical that the promoters would have agreed to deal with Mr. Feinsmith upon his joining Randy Hall, when at that time their identity was already known by Mr. Perry and/or Mr. Rosenthal. Such is especially true given the fact that the promoters knew when Mr. Feinsmith joined Randy Hall that respondent was investigating either or both of the other shareholders and were edgy about respondent's learning their (the promoters') identity. Respondent also could have presented the testimony of Mr. Rosenthal as to his understanding of Mr. Feinsmith's involvement in the scheme. Respondent also could have introduced into evidence one or more Randy Hall checks that were paid to the promoters for the false invoices and that were traceable to Mr. Feinsmith; e.g., by his signature. Although the record contains many of the false invoices, it contains none of

the Randy Hall checks which were given to the promoters in consideration for those invoices.[6]

Nor do we read the cooperation agreement or affidavits to support a finding of fraud. Mr. Feinsmith's affidavits, for example, merely state that he agrees that he received income "because of the false deductions". The cooperation agreement states similarly that "the false invoices * * * created the fraudulent business deductions and the unreported income". None of these documents states specifically that the income is attributable to Mr. Feinsmith's receipt (in either his individual capacity or on behalf of Randy Hall) of any of the proceeds of the scheme.[7] Nor does either document indicate why Mr. Feinsmith realized that income in the first place. The mere fact that a closely held corporation has claimed improper deductions does not necessarily mean that its shareholders have realized income in the amount of the deductions. A shareholder such as Mr. Feinsmith realizes income through a constructive distribution

---

[6] We also would have liked to have heard from Mr. Feinsmith as to his understanding of his part in the scheme. For some unexplained reason, however, respondent waited until almost 4 years after Mr. Feinsmith's death to issue the notice of deficiency to his estate. In fact, respondent did not issue the notice of deficiency to the estate until more than 10 years after the Court of Appeals for the Second Circuit affirmed the promoters' convictions.

[7] We also note that the parties have stipulated that Mr. Feinsmith's approximately $48,000 of income is taxable to him as "constructive dividend income * * * arising out of deductions not allowable on the corporate tax return of Randy Hall".

only when the corporation uses its money or property primarily to benefit the shareholder.  See Laure v. Commissioner, 70 T.C. 1087, 1108 (1978), affd. in part, revd. in part and remanded 653 F.2d 253 (6th Cir. 1981); see also Wilkof v. Commissioner, T.C. Memo. 1978-496 ("Laure does support the proposition * * * that to the extent that a taxpayer can show an absence of direct benefit to himself he may escape constructive dividend treatment"), affd. 636 F.2d 1139 (6th Cir. 1981).  We are unable to find that Randy Hall used its money or property primarily to benefit Mr. Feinsmith.[8]

We also do not view Mr. Feinsmith's amended returns as indicating that he received cash from the scheme.  The fact that Mr. Feinsmith considered the reported income attributable to the disallowed deductions, rather than to his conversion of corporate cash, is seen quickly from the fact that he recognized most of that income in years other than the years in which the cash was purportedly received by him upon conversion.  A shareholder's conversion of cash for his or her personal use is treated as a constructive distribution of that cash, and such a distribution is realized by a cash basis shareholder such as Mr. Feinsmith in the year of conversion.  See secs. 301(c), 316; Truesdell v.

---

[8] Of course, a taxpayer such as Mr. Feinsmith may agree to recognize an item as income in lieu of criminal prosecution.  The fact that he agrees to recognize that income in a year for which a return has already been filed does not necessarily mean that he filed that return fraudulently.

Commissioner, 89 T.C. 1280, 1295 (1987); see also Toushin v. Commissioner, T.C. Memo. 1999-171, affd. 223 F.3d 642 (7th Cir. 2000).  The $31,667 recognized by Mr. Feinsmith as income for 1983 was mainly attributable to false invoices purchased in 1982. The $52,320 recognized by Mr. Feinsmith as income for 1984 (by way of the second amended return) was almost entirely attributable to false invoices purchased in 1983.  Given the fact that the purchase of the false invoices by the corporations and the conversion of the cash by the principals appears to us to have occurred contemporaneously, that income, were it in fact attributable to Mr. Feinsmith's conversion of cash, as respondent asserts, would have been properly recognized on Mr. Feinsmith's personal income tax returns for 1982 and 1983, respectively. Moreover, Mr. Feinsmith recognized in income his portion of the full amount of the false invoices which entered into the cost of goods sold deductions.  The Court of Appeals for the Second Circuit stated that principals participating in the scheme converted to their personal use only part of the false invoice amounts.[9]

---

[9] We also note that Mr. Feinsmith indicated explicitly in his affidavits that his recognition of income from the scheme rested on whether he was a Randy Hall shareholder, rather than on whether he personally received cash from the scheme.  As he stated in his affidavits:  "I did not receive any income as a result of Randy Hall, Inc.'s false deductions for the fiscal year ending January 31, 1981 because I was not a shareholder for any portion of that year."

We are similarly unconvinced that Mr. Feinsmith knew that either of his returns was fraudulent when he filed it. In order to support a determination of fraud, respondent must prove clearly and convincingly that Mr. Feinsmith had at the time he filed his personal income tax returns the requisite intent to evade taxes known or believed to be owing. As we read the cooperation agreement and the affidavits, those documents were carefully worded so as to speak as of the time that the documents were prepared and not as of the time that the returns were filed. Those documents merely establish that Mr. Feinsmith knew about the unreported income when the documents were prepared. They do not establish that he knew about that income when the returns were filed.

Moreover, as of March 29, 1985, the date of the cooperation agreement, Mr. Feinsmith's 1984 return had not yet been filed. The cooperation agreement provided explicitly that it would be void (meaning that Mr. Feinsmith would be subject to prosecution, including through the use of any statement or document that he made or gave to the U.S. Attorney's Office during its investigation) were Mr. Feinsmith not to comply fully with the expressed understandings of the parties thereto. One of those understandings was that Mr. "Feinsmith must at all times give complete, truthful and accurate information and testimony and must not commit any further crimes whatsoever." We find it unlikely that Mr. Feinsmith would have intentionally omitted

income from his 1984 return had he known of the income.[10] Such an intentional omission would have voided the cooperation agreement and would have subjected Mr. Feinsmith to criminal prosecution in addition to any taxes payable on the omitted income.[11]

We conclude that respondent has failed to carry his burden of proving fraud for both of the subject years. Respondent has failed to convince us clearly that Mr. Feinsmith was liable for fraud in either year.

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[10] We also disagree with respondent's assertion that Mr. Feinsmith's intent to file a false return may be found in the fact that he did not tell his accountant about his income from the scheme. As discussed above, we are unable to find as a fact that Mr. Feinsmith knew about the unreported income when he filed his returns. Thus, he could not have told his accountant about it beforehand. Nor do we believe that Mr. Feinsmith was as "astute" as respondent claims.

[11] We note in passing that the cooperation agreement provided that Mr. Feinsmith would "file amended personal income tax returns for the period February 1, 1980 to the present [i.e., Mar. 29, 1985]" in order to report his agreed-upon income attributable to the scheme. We do not understand this provision to mean that Mr. Feinsmith knew that he would be filing a fraudulent return for 1984 and would later have to amend it. We read this provision simply to require that Mr. Feinsmith report on his personal income tax returns all of the agreed-upon income, let it be by way of an amended return or by way of an original return. In fact, whereas the cooperation agreement literally requires that Mr. Feinsmith amend each of his returns from 1980 through 1985, he actually amended only his 1983 and 1984 returns.